## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

GREGORY CONTE AND WARREN
BALOGH,

          Plaintiffs,

v.

COMMONWEALTH OF VIRGINIA,
TERENCE R. MCAULIFFE, VIRGINIA
STATE POLICE, STEVEN FLAHERTY,
BECKY CRANNIS-CURL, BRIAN
JOSEPH MORAN, CITY OF
CHARLOTTESVILLE, MICHAEL
SIGNER, WES BELLAMY,
CHARLOTTESVILLE POLICE
DEPARTMENT, AL THOMAS, JR.,
EDWARD GORCENSKI, SETH
WISPELWEY, DWAYNE DIXON,
DARYL LAMONT JENKINS, LACEY
MACAULEY,

          Defendants.

Civil Action No.: 3:19cv575



AUG 1 2 2019

CLERK, U.S. DISTRICT COURT
RICHMOND VA

## COMPLAINT

Plaintiffs GREGORY CONTE AND WARREN BALOGH, *pro se*, for their

Complaint against Defendants state as follows:

### NATURE OF THE ACTION

1.     This is an action for violations of Plaintiffs' civil and constitutional rights

under the First and Fourteenth Amendments, 28 USC §2201 and §2202; 42 USC § 1983 *et*

*seq.*, and for relief under Federal Rules of Civil Procedure 57 and 65.

2.     This case concerns Plaintiffs' attendance and Defendants' involvement in

the August 12, 2017 Unite the Right ("UTR") rally at and around Lee Park in

Charlottesville, Va. – a lawfully permitted assembly for which United States District Judge

Glen E. Conrad of this Court granted a preliminary injunction on August 11, 2017, enjoining the City of Charlottesville, Va. and its City Manager Maurice Jones from enforcing their eleventh-hour attempt to revoke the permit and prevent the demonstration from proceeding.

3.     In a deliberate effort to deter UTR demonstrators from expressive activity and in open defiance of Judge Conrad's order, Defendants intentionally encouraged and facilitated mob violence by counter-protestors against lawful UTR demonstrators, creating a civil disturbance as a pretext to disperse the demonstrators before the UTR rally began. This action concerns Defendants' responsibility for their intentional violations of Plaintiffs' civil and constitutional rights to free speech and assembly, due process, and equal protection of the laws.

## **PARTIES**

4.     Plaintiff Gregory Conte is a citizen of the United States and of the State of Maryland.  He attended the UTR demonstration and was assaulted there by counter-protestors and law enforcement officers.

5.     Plaintiff Warren Balogh is a citizen of the United States and of the State of Pennsylvania. He attended the UTR demonstration and was assaulted there by counter-protestors and law enforcement officers.

6.     Defendant the Commonwealth of Virginia is a governmental entity capable of suing and being sued pursuant to the Virginia Tort Claims Act, Virginia Code § 8.01-195.1.

2

7.     Defendant Terence McAuliffe was the Governor of Virginia and a final policymaker for the Commonwealth on and around August 12, 2017 and other relevant times. He is named in his individual capacity.

8.     Defendant Virginia State Police is an agency of the Commonwealth of Virginia headquartered in Richmond.

9.     Defendant Steven Flaherty was a Colonel in the Virginia State Police and a superintendent and final policymaker with respect to Virginia State Police operations at and around Lee Park on August 12, 2017 and other relevant times. He is named in his individual capacity.

10.     Defendant Becky Crannis-Curl was a Lieutenant in the Virginia State Police and the ground commander and a final policymaker at and around Lee Park on August 12, 2017 and other relevant times. She is named in her individual capacity.

11.     Brian Joseph Moran was Secretary of Public Safety and Homeland Security for Virginia, a final policymaker, and the highest ranking official present in the "command center" on August 12, 2017.

12.     Defendant City of Charlottesville, Va. (the "City") is a municipality located in the Commonwealth of Virginia.

13.     Defendant Michael Signer was the Mayor of Charlottesville, Va. and a final policymaker for the City on and around August 12, 2017 and other relevant times. He is named in his individual capacity.

14.     Defendant Wes Bellamy was the Vice Mayor of Charlottesville, Va. and a final policymaker for the City on and around August 12, 2017 and at other relevant times. He is named in his individual capacity.

3

15.     Defendant Charlottesville Police Department is an agency of the City of Charlottesville headquartered in Charlottesville, Va.

16.     Defendant Al Thomas, Jr. was the Chief of Police of the City and a final policymaker for the City on and around August 12, 2017 and other relevant times. He is named in his individual and official capacities.

17.     Edward Gorcenski, a.k.a., Emily Gorcenski, is a citizen of the United States and of the State of Virginia. He is an Antifa leader who was present at the rally of August 12, 2017.

18.     Seth Wispelwey is a citizen of the United States and of the State of Virginia. He is an Antifa leader who was present at the rally of August 12, 2017.

19.     Dwayne Dixon is a citizen of the United States and of the State of North Carolina. He is an Antifa leader who was present at the rally of August 12, 2017.

20.     Daryl Lamont Jenkins is a citizen of the United States and of the State of New Jersey. He is an Antifa leader who was present at the rally of August 12, 2017.

21.     Lacy MacAuley is a citizen of the United States and resident of the District of Columbia. She is an Antifa leader who was present at the rally of August 12, 2017.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 1343, § 2201 and § 2202; 42 USC § 1983 et seq., and Federal Rules of Civil Procedure 57 and 65. Venue is proper over each claim and each defendant pursuant to 28 U.S.C. § 1391(b)(1) and/or (b)(2).

## FACTS

23.     Plaintiffs and other demonstrators attended the UTR rally to engage in expressive political activity in opposition to a proposal by the Charlottesville City Council to

4

remove the statue of Confederate General Robert E. Lee from Lee Park in Charlottesville, Va. ("Lee Park").

24. The UTR rally concerned an issue which was at the time and remains now a matter of public concern and debate both nationally and in various localities, namely, the attempt to blot out historical figures and events associated with the Confederacy or European-American history in general by removing statues and memorials and renaming places and institutions that commemorate the Confederacy, individuals associated with it, and other elements of the historic American nation.

25. As one example, in May of 2017, the City of New Orleans removed the statues of three historic figures associated with the Confederacy, including a statue of General Lee which had sat atop a 60-foot column since its dedication in 1884 and was listed on the National Register of Historic Places. Numerous states, including Virginia, have passed laws restricting the disturbance or removal of memorials for war veterans, and the 2017 debate over the City's renaming of Lee Park and its proposal to remove the statue of General Lee implicated issues of legal and public concern that continue to be contested to this day. *See* Va. Code § 15.2-1812.

26. Due to motives which may have included pressure from special interest groups, political ambition, or personal interest, each of the Defendants at various times intentionally violated the Constitutional and civil rights of Plaintiffs and other UTR demonstrators in an effort to prevent the UTR demonstrators from expressing their opinions in favor of a specific viewpoint and engaging in a debate of local and national concern. Defendants persisted in doing so even after this Court ordered that the UTR demonstration be allowed to proceed as it should have been lawfully permitted to do.

27.     Notwithstanding the Injunction Order, in a series of escalating efforts to control public debate, Defendants intentionally brought UTR demonstrators and counter-protestors into direct conflict and made that conflict unavoidable for UTR demonstrators seeking to exercise their rights.  Rather than applying simple and proven techniques such as allowing UTR demonstrators and counter-protestors to use separate areas, the Defendants forced them together into a restricted space, then deliberately communicated to counter-protestors that attacks on UTR demonstrators would go unpunished. Predictably and as Defendants intended, counter-protestors attacked and assaulted UTR demonstrators, and the Defendants used those violent attacks against lawful demonstrators as a pretext to disperse the entire gathering.

The Permit

28.     On June 13, 2017, in preparation for the UTR demonstration, a citizen of Virginia named Jason Kessler secured a permit to hold the event at Lee Park, by the statue of General Lee, on August 12, 2017.

29.     On August 7, 2017, less than one week before the demonstration, the City notified Kessler that it was revoking the UTR permit.  The City further stated that it was "modif[ying]" the permit to require that the demonstration take place at McIntire Park, which is located more than a mile from Lee Park and downtown Charlottesville.

30.     At the same time, the City took no action to modify or revoke the permits issued to counter-protestors for demonstrations planned within blocks of Lee Park.  In revoking the UTR permit, the City cited "safety concerns" allegedly associated with the event, but cited no source for those concerns and provided no explanation for why the concerns only resulted in adverse action being taken on Kessler's permit.

31.     In response to the revocation of his permit for the UTR demonstration, Kessler sued the City and City Manager Maurice Jones under 42 U.S.C. § 1983 for violation of his First and Fourteenth Amendment rights. On August 11, 2017, the United States District Court for the Western District of Virginia, Judge Glen E. Conrad presiding, enjoined the City from revoking Kessler's permit to hold the UTR demonstration at Lee Park on the following day. *Kessler v. City of Charlottesville, Va., et al.,* Case No. 3:17-cv-00056, 2017 WL 3474071 (W.D. Va. Aug. 11, 2017) (the "Injunction Order").

### The UTR Demonstration

32.     In the leadup to and throughout August 12, 2017, Defendants engaged in a series of acts designed to restrict UTR demonstrators from expressing specific viewpoints while at the same time permitting counter-protestors to engage in violent and lawless behavior. Defendants undertook these acts under color of state law and with deliberate hostility and indifference to the rights of Plaintiffs and other UTR demonstrators.

33.     Despite having been granted permits to protest at two separate parks in downtown Charlottesville, counter-protestors including large numbers of "Antifa" rallied on Market Street right outside Lee Park, where UTR was lawfully permitted. City and State Police positioned themselves behind barriers to the North of Market Street, restricting UTR demonstrators from entering by any means other than the Market Street entrances.

34.     Antifa and other counter-protestors positioned themselves to block anyone else from entering and leaving the park, knowing that police would not remove or disperse them, and challenging anyone who sought to pass through their ranks. When attendees tried to pass, Antifa locked arms and attacked with fists, poles, hammers, and other weapons.

7

35.    No such combat would have occurred at the UTR demonstration if not for the deliberate acts of Defendants.  When Antifa is not present and allowed to attack, no violence occurs at gatherings of demonstrators sympathetic to the UTR rally.  Pro-UTR demonstrators gathered in Charlottesville two other times in May and October 2017, both before and after UTR.  Neither time did violence break out, because violence is not a component of UTR demonstrators' viewpoints.  The same cannot be said of Antifa, who notoriously rioted in Washington, DC during Trump's inauguration, blocking check-points, burning cars, and smashing windows. This pattern of behavior has been apparent in countless other incidents around the country, especially in the last two years.

36.    At the UTR rally on August 12, 2017, Chief Thomas and Lt. Crannis-Curl were present in supervisory and/or final decision making capacities. Charlottesville police divided the protest area up into 5 police zones. Each zone had a police supervisor, and Lt. Crannis-Curl supervised all VSP present.

37.    Former Chief Al Thomas was present in his capacity as Chief of Police of the Charlottesville City Police Department. As Chief, Mr. Thomas was a final decision maker regarding law enforcement in Charlottesville at all relevant times.

38.    Upon being advised that violence had broken out the Chief stated, in a complete capitulation to violent counter-protestors, "Let them fight, it will make it easier to declare an unlawful assembly."  After UTR, Al Thomas destroyed relevant evidence by deleting text messages and other electronic information and then using personal e-mail to discuss particularized FOIA requests by the Charlottesville's own choice for professional review of the event.

39.     Al Thomas also falsely denied wrongly using his personal email to deal with public records requests.  Many Charlottesville police officers told investigators working for the City that they feared "retribution" from Al Thomas if they told the truth about protest events.

40.     Other, higher organizations have refused to talk, notably the Virginia State Police, who released minimal documentation.  Thomas later told his assistant that VSP was refusing to cooperate with CPD in an effort to remain blameless for the events of August 12.  The Governor's office, too, resisted the Heaphy investigation.  These state officials are senior to CPD and had every reason to know what was likely to happen if Antifa was given free rein.  Yet they did not coordinate effectively with CPD, and in fact, it was VSP who formed the riot line that pushed dozens of protestors (including Plaintiffs) out of Lee Park and into Antifa, despite the fact that VSP had total control of other, safer means of exit.

41.     Lieutenant   Crannis-Curl—VSP's   ground   commander   inside   of Emancipation Park (referred to as "Venue Security" in VSP's operational plan) commented to other CPD commanders that she had created a "new zone" that morning. According to a third-party investigative report conducted by Timothy Heaphy (the "Heaphy Report"), none of the other CPD commanders present even knew what this comment meant, reflecting the VSP's deliberate indifference and outright defiance of its task of securing public safety at the event.

42.     All four other Charlottesville commanding officers corroborated what Crannis-Curl said next.  She told Shifflett that VSP was going "off-plan" and that she was not going to send any troopers out into the crowds to make arrests.  Crannis-Curl added that VSP intended to leave Charlottesville with the same number of troopers they brought in. Colonel Steven Flaherty, the VSP Superintendent, interrupted her to say that VSP's

9

primary role on August 12 was "park security," and troopers were not going to "wade into the mess on Market Street."

43.     Lt. Crannis-Curl allowed a heckler's veto as soon as people began arriving for the UTR event. She refused to send "arrest teams" into the street and effectively communicated this order to all VSP under her command.

44.     Other VSP troopers advised Charlottesville police that they would not send VSP troopers to engage the crowd "if safety was compromised." Still others advised citizens or City police they were "under orders" not to intervene or "not to break up fights." So strictly did VSP adhere to this non-intervention order that even when citizens begged for help the VSP refused stating they were "not available" to help. Another VSP trooper advised a citizen he would not intervene until "ordered to do so."

45.     Charlottesville police were operating under a similar non-intervention order initiated by Chief Al Thomas. In preparation for UTR on August 12, 2017, Chief Thomas made it very clear that his police would not be doing their jobs. He told his subordinates after a previous July 8, 2017 demonstration that "I'm not going to get [protestors] in and out" during the UTR rally.

46.     The Heaphy Report commissioned by the City found that "Rather than engage the crowd and prevent fights, the [Charlottesville police department] plan was to declare the event unlawful and disperse the crowd." Charlottesville officers received the orders implementing this plan loud and clear. Charlottesville officers told third party investigators that they had been ordered not to engage over "every little thing"; not to "go in and break up fights"; not to interrupt "mutual combat"; and officers were not to be sent out among the crowd where they might get hurt.

10

47.     Charlottesville police obeyed these orders. At one point a citizen begged  them to do something while fighting broke out directly in front of Charlottesville police officers. The fighting had started when counter-protestors crowded around a park entrance and refused UTR attendees access to the rally location. The officers stood in silence staring at the results of this heckler's veto in progress.

48.     Eventually, law enforcement moved in – not to break up any fighting, but rather to declare an unlawful assembly.  The order to disperse was not enforced against counter-protestors, only against UTR demonstrators in the park they were legally occupying pursuant to the City's permit and the Injunction Order. VSP officers advanced with riot shields and batons on Plaintiffs and other lawfully permitted demonstrators, deployed pepper spray against them, and physically pushed Plaintiffs and other UTR demonstrators from Lee Park.

49.     After the police declared that people gathered in and around Lee Park were engaged in an "unlawful assembly," Plaintiffs and the vast majority of other UTR demonstrators dispersed. Antifa did not. Instead, they hounded rally-goers who were trying to get back to their cars and hotel rooms. Even after a state of emergency was declared, Antifa and their auxiliaries continued parading through the streets, attacking police and intimidating citizens for hours. Not a single one has been prosecuted.

50.     As a result of Defendants' deliberate interference and pretextual dispersal order, Plaintiffs and other UTR demonstrators were unable to peacefully rally, hear any speakers, or engage in other lawful political speech or expressive activity. Moreover, Plaintiffs were forced to defend themselves from physical violence wrongfully perpetrated by violent counter-protestors and by VSP officers themselves.

11

51.     Defendants expected violent counter-protestors to attempt a heckler's veto of the UTR rally. Defendants had received intelligence prior to August 12, 2017 that violent counter-protestors would be in attendance and planning to engage in violence including by throwing soda cans filled with concrete.

52.     The City of Charlottesville routinely grants permits for public spaces to persons it deems to have non-controversial or acceptable political views. It also permits unpermitted and technically unlawful rallies to be held by those with what the City considers acceptable political views. Yet the Defendants acquiesced in a heckler's veto of the Plaintiffs' views because Charlottesville is the "capital of the resistance" and "intolerance is not welcome here."

53.     The actions of all Defendants set forth herein were taken under color of state law and were deliberately indifferent to the rights of the Plaintiffs.

54.     Plaintiff Balogh was exposed to the chemical "pepper spray" like substance deployed by the police. The chemical hit his head. He suffered a burning sensation as the chemical mixed with his sweat and suffered temporary loss of vision. He had to seek treatment at a medical tent.

55.     Plaintiff Balogh experienced a burning feeling days after the exposure to the chemical. When he showered, the residue from the chemical burned his eyes days after the incident.

56.     Sometime after exiting the park, Plaintiff Balogh was struck by a masked attacker wielding a stick like weapon from behind in the arm. The attack caused a tingling sensation and resulted in him not being able to close his hand for some time.

57.     Plaintiff Balogh was not able to properly identify his attacker due to Defendants failure to enforce V.A Code § 18.2-422 "Prohibition of wearing of masks in certain places" and exceptions regarding counter-protestors such as Antifa.

58.     Both Plaintiffs had their First Amendment Rights violated and had assembled lawfully in respect to the permit that was granted to the rally organizers.

59.     Both Plaintiffs were forcefully pushed by police riot shields and denied a safe exit from the park.

60.     Defendants' use of any chemical "mace" or "pepper spray" like substance on Plaintiffs and other attendees was unnecessary due to the fact that there was no violence within the park.

## COUNT I
### 42 U.S.C. §1983: Freedoms of Speech, Assembly, Right to Petition – First Amendment

61.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

62.     By the above-referenced acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their right to freedom of speech, their right to freedom of assembly, and their right to petition the Government for a redress of grievances in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

63.     At the time Plaintiffs were ordered to leave the UTR rally, they and other UTR demonstrators were attempting to engage in expressive activity that is protected by the First Amendment. Defendants' actions injured Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in that activity.

64.     The viewpoints and constitutionally protected activity of Plaintiffs and other UTR demonstrators motivated Defendants' adverse actions. Defendants acted with a retaliatory intent or motive.

13

65.     It was clearly established by order of this Court on August 11, 2017, that the Defendants had a constitutional duty not to interfere with the protected speech activity of Plaintiffs and other UTR demonstrators. Instead, Defendants engineered, ratified and effectuated a heckler's veto, joining and facilitating a mob of counter-protestors intent on suppressing speech, in deliberate disregard of their obligation to allow Plaintiffs and other UTR demonstrators to exercise their constitutional and legally permitted rights. By designing and executing a plan to force the UTR demonstrators into confrontation with violent counter-protestors, Defendants violated Plaintiffs' rights protected by the First Amendment.

66.     Defendants' actions were content- and viewpoint-based in violation of the First Amendment.

67.     Defendants' policy and/or practice and its enforcement against Plaintiffs as set forth in this Complaint violated Plaintiffs' rights to freedom of speech, to freedom of assembly, and to petition the government protected by the First Amendment. Defendants' actions were taken under color of state law and were willful, wanton, malicious, and/or deliberately indifferent to Plaintiffs' rights.

68.     As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs and others suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

## COUNT II
### 42 U.S.C. §1983: Equal Protection – Fourteenth Amendment

69.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

70.     By the above-referenced acts, policies, practices, procedures, and/or customs, created, adopted, and/or enforced under color of state law, Defendants have deprived Plaintiffs

14

of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

71.     By granting use of a public forum to people whose political views Defendants find acceptable, but denying use to those expressing less favored or more controversial views, such as those expressed by Plaintiffs and other UTR demonstrators, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

72.     Defendants' policy, practice, and actions as applied against Plaintiffs' political speech activity on August 12, 2017 violated the Equal Protection Clause of the Fourteenth Amendment. Defendants' actions were taken under color of state law and were willful, wanton, malicious, and/or deliberately indifferent to Plaintiffs' rights.

73.     As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiffs suffered irreparable harm, including the loss of his fundamental constitutional rights, entitling him to declaratory and injunctive relief and damages.

### COUNT III
### 42 U.S.C. §1983: Supervisory Liability

74.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

75.     Defendants Thomas, Crannis-Curl, Flaherty, and Moran were supervisors of police personnel on August 12, 2017.

76.     Defendants Thomas, Crannis-Curl, Flaherty, and Moran each issued orders and/or acquiesced in actions that violated the rights of the Plaintiff as stated herein. Defendants Thomas, Crannis-Curl, Flaherty, and Moran each reasonably could have and should have stopped, or tried to stop, the heckler's veto and obstruction of Plaintiff's rights from occurring. Instead, they each took affirmative steps to see that said heckler's veto successfully negated the Plaintiff's rights.

77.      Defendants Thomas, Crannis-Curl, Flaherty, and Moran's misconduct was taken under color of state law and was willful, wanton, malicious, and/or deliberately indifferent to the constitutional rights of the plaintiffs.

78.      As a direct and proximate result of Defendants' actionable misconduct, Plaintiffs suffered irreparable harm, including the loss of his fundamental constitutional rights, entitling him to declaratory and injunctive relief and damages.

## COUNT IV
### 42 U.S.C. §1983: Gross Negligence – Failure to Train

79.      Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

80.      Defendants Commonwealth of Virginia, Terence R. McAuliffe, Virginia State Police, Steven Flaherty, Becky Crannis-Curl, Brian Joseph Moran, City of Charlottesville, Michael Signer, Wes Bellamy, Charlottesville Police Department, and Al Thomas, Jr. intentionally failed to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another and were thus grossly negligent.

81.      Defendants demonstrated such gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness.

82.      Defendants' failure to train Virginia State and Charlottesville police officers amounted to deliberate indifference, at best, and willful, malicious harm, at worst, to the rights of Plaintiffs.

83.      Police intended to plan for the permitted rally at Lee Park but were told to plan instead for MacIntyre Park when the local government illegally revoked the permit at Lee Park, moving the entire event to a different park.

84. The American Civil Liberties Union sued the City of Charlottesville, arguing that the removal of the rally to MacIntyre Park was an unconstitutional violation of the freedom of speech, and the rally was moved back to Lee Park.

85. The police, however, failed to plan for the rally as reestablished at its original location.

86. Defendants failed to train police and deliberately interfered in the duties of each and every officer assigned to the rally that day, resulting in irreparable harm to the Plaintiffs.

## COUNT V
### Violation of 18 U.S.C. § 1962(c)

87. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

88. This Count is against Defendants Commonwealth of Virginia, Terence R. McAuliffe, Virginia State Police, Steven Flaherty, Becky Crannis-Curl, Brian Joseph Moran, City of Charlottesville, Michael Signer, Wes Bellamy, Charlottesville Police Department, and Al Thomas, Jr. Edward Gorcenski, Seth Wispelwey, Dwayne Dixon, Daryl Lamont Jenkins, and Lacy MacAuley (the "Count V Defendants").

89. The Virginia State Police is an enterprise engaged in and whose activities affect interstate commerce. The Count V Defendants are employed by or associate with the enterprise.

90. The Office of the Governor of Virginia is an enterprise engaged in and whose activities affect interstate commerce. The Count V Defendants are employed by or associate with the enterprise.

17

91.    The Charlottesville Police Department is an enterprise engaged in and whose activities affect interstate commerce. The Count V Defendants are employed by or associate with the enterprise.

92.    The Office of the Major of Charlottesville is an enterprise engaged in and whose activities affect interstate commerce. The Count V Defendants are employed by or associate with the enterprise.

93.    The Count V Defendants agreed to and did conduct and participate in the conduct of the above enterprises affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally depriving the Plaintiffs of their constitutional[1] and property rights.[2] Specifically, in violation of 18 U.S.C. § 1961(1)(A), obstruction of State or local law enforcement and violations of 18 U.S.C. § 2339 (relating to harboring terrorists), § 2339A (relating to providing material support to terrorists), § 2339B (relating to providing material support to terrorist organizations), and § 2339C (relating to financing of terrorism), the terrorists, terrorist organizations, and terrorism being the Antifa and related organizations, including those connected to Defendants Gorcenski, Wispelwey, Dixon, Jenkins, and MacAuley.

94.    Pursuant to and in furtherance of their scheme, Defendants committed multiple related acts of racketeering, to wit: Defendants utilized force and the threat of force to deprive Plaintiffs of their Constitutional rights, expose their persons to harm, and unlawfully abrogate their permit to assemble. Count V Defendants also violated 18 U.S.C. § 1962(1)(B) and 18 U.S.C. § 1951(a) [*Interference with commerce by threats or violence*],

---

[1] Specifically, the Count IV Defendants intended to deprive Plaintiffs of a variety of their rights under the 1st Amendment, including, but not limited to, their right to free speech and right to assemble.
[2] Specifically, the Count IV Defendants intended to deprive Plaintiffs of their property rights, including, but not limited to their right of use, of their permit to peaceable assemble.

in that Count V Defendants did conspire to and enact a scheme against Plaintiffs, who are not citizens of the Commonwealth, to prevent their exercise of their Constitutional rights and property rights, and, in so doing, caused Plaintiffs to fear further discrimination at the hands of the Defendants should the Plaintiffs return to the Commonwealth of Virginia and/or avail themselves of its amenities.

95.    The acts in violation of 18 U.S.C. §§ 1961, 1962(c), and 1951(a) set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. 1961(5).

96.    The Count V Defendant have directly and indirectly conducted and participated in the conduct of the enterprises' affairs through a pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

97.    As a direct and proximate result of the Count V Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that: Plaintiffs were deprived of their right to speak freely, were harassed, assaulted, and insulted, were placed in danger of severe bodily injury, were deprived of their constitutionally protected right to assemble, were made subject to invasion of privacy, and were deprived their rights under their rightfully obtained permit to protest.

98.    Plaintiff Balogh was exposed to the chemical "pepper spray" like substance deployed by the police. The chemical hit his head. He suffered a burning sensation as the chemical mixed with his sweat and suffered temporary loss of vision. He had to seek treatment at a medical tent.

99.     Plaintiff Balogh experienced a burning feeling days after the exposure to the chemical. When he showered, the residue from the chemical burned his eyes days after the incident.

100.    Sometime after exiting the park, Plaintiff Balogh was struck by a masked attacker wielding a stick like weapon from behind in the arm. The attack caused a tingling sensation and resulted in him not being able to close his hand for some time.

101.    Plaintiff Balogh was not able to properly identify his attacker due to Defendants failure to enforce V.A Code § 18.2-422 "Prohibition of wearing of masks in certain places" and exceptions regarding counter-protestors such as Antifa.

102.    Both Plaintiffs had their First Amendment Rights violated and had assembled lawfully in respect to the permit that was granted to the rally organizers.

103.    Both Plaintiffs were forcefully pushed by police riot shields and denied a safe exit from the park.

104.    Defendants' use of any chemical "mace" or "pepper spray" like substance on Plaintiffs and other attendees was unnecessary due to the fact that there was no violence within the park.

**COUNT VI**
**Violation of 18 U.S.C. § 1962(d)**

105.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

106.    This Count is against Defendants Commonwealth of Virginia, Terence R. McAuliffe, Virginia State Police, Steven Flaherty, Becky Crannis-Curl, Brian Joseph Moran, City of Charlottesville, Michael Signer, Wes Bellamy, Charlottesville Police

20

Department, and Al Thomas, Jr. Edward Gorcenski, Seth Wispelwey, Dwayne Dixon, Daryl Lamont Jenkins, and Lacy MacAuley (the "Count VI Defendants").

107.    As set forth above, the Count VI Defendants agreed and conspired to violate 18 U.S.C. § 1962(a)-(c). Specifically, the Count VI Defendants used monetary resources from the state to fund their scheme to illegally deprive Plaintiffs of their constitutional and property rights under the color of law and conducted and/or participated in the conduct of the affairs of the enterprise to further the Defendant's plan to deprive the Plaintiffs of their constitutional and property rights.

108.    The Count VI Defendants have intentionally conspired and agreed to acquire or maintain an interest in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count VI Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme as described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a)-(c), in violation of 18 U.S.C. § 1962(d).

109.    As a direct and proximate result of the Count VI Defendants conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their businesses and property in that: Plaintiffs were deprived of their right to speak freely, were harassed, assaulted, and insulted, were placed in danger of severe bodily injury, were deprived of their constitutionally protected right to assemble, were made subject to invasion of privacy, and were deprived their rights under their rightfully obtained permit to protest.

110.   Plaintiff Balogh was exposed to the chemical "pepper spray" like substance deployed by the police. The chemical hit his head. He suffered a burning sensation as the chemical mixed with his sweat and suffered temporary loss of vision. He had to seek treatment at a medical tent.

111.   Plaintiff Balogh experienced a burning feeling days after the exposure to the chemical. When he showered, the residue from the chemical burned his eyes days after the incident.

112.   Sometime after exiting the park, Plaintiff Balogh was struck by a masked attacker wielding a stick like weapon from behind in the arm. The attack caused a tingling sensation and resulted in him not being able to close his hand for some time.

113.   Plaintiff Balogh was not able to properly identify his attacker due to Defendants failure to enforce V.A Code § 18.2-422 "Prohibition of wearing of masks in certain places" and exceptions regarding counter-protestors such as Antifa.

114.   Both Plaintiffs had their First Amendment Rights violated and had assembled lawfully in respect to the permit that was granted to the rally organizers.

115.   Both Plaintiffs were forcefully pushed by police riot shields and denied a safe exit from the park.

116.   Defendants' use of any chemical "mace" or "pepper spray" like substance on Plaintiffs and other attendees was unnecessary due to the fact that there was no violence within the park.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against the Defendants as follows:

A.      Declaring that Defendants violated Plaintiffs' fundamental constitutional rights to freedom of speech, equal protection, and due process as set forth in this Complaint;

B.      Declaring that Plaintiffs have a fundamental constitutional right to protest in the City of Charlottesville and the State of Virginia;

C.      Permanently enjoining Defendants' heckler's veto policy and practice and its application to Plaintiffs' speech and related activities as set forth in this Complaint;

D.      Awarding Plaintiffs costs, interest and reasonable attorneys' fees for this action pursuant to 42 U.S.C. §1988 and other relevant statutes; and,

E.      Awarding Plaintiffs damages against the City of Charlottesville and all official capacity Defendants;

F.      Awarding Plaintiffs compensatory damages in an amount to be shown at trial against all individual capacity Defendants;

G.      Awarding  Plaintiffs punitive damages against all individual capacity defendants;

H.      Awarding Plaintiffs costs and reasonable attorney fees incurred in this action;

I.      Awarding Plaintiff prejudgment interest; and

J.      Awarding such other and further relief as the Court may deem just and proper.

23

Dated: 09 August 2019                           Respectfully Submitted,

Gregory Conte
P.O. Box 3874
Gaithersburg, MD 20878
Phone: 240.449.4584
Pro Se

Warren Balogh
P.O. Box 6037
Pittsburgh, PA 15211
Phone: 412.326.9767
Pro Se

## CERTIFICATION

Augustus Invictus, Esq., 424 E. Central Blvd. #154, Orlando, Florida 32801, 310.824.3725, prepared, or assisted in the preparation of, this document.

Gregory Conte

Executed on: _8 · 10 - 19_

Warren Balogh

Executed on: _8/9/19_